UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE  DIVISION

| | | |
|---|---|---|
| TIMOTHY L. RUNYON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:07-cv-0040-LJM-WGH |
| | ) | |
| APPLIED EXTRUSION TECHNOLOGIES, | ) | |
| INC., and TROY M. CORBETT, | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT APPLIED EXTRUSION TECHNOLOGIES, INC.'S
MOTION FOR SUMMARY JUDGMENT**

In this case Tim Runyon has sued his former employer Applied Extrusion Technologies, Inc. ("AET"), claiming that AET terminated his employment because of his age in violation of the Age Discrimination in Employment Act ("ADEA") and negligently retained another employee, Troy Corbett ("Corbett"), in violation of Indiana state law. Runyon has also asserted a state law claim for battery against Corbett.

This cause is before the Court on AET's Motion for Summary Judgment on each of the claims asserted against it.  In his response brief, Runyon indicates that he does not intend to pursue his negligent retention claim.  The Court understands him to be abandoning this claim and therefore will grant summary judgment in AET's favor on this claim.  Having considered AET's Motion and supporting and opposing materials, the Court rules as follows.

## I. **FACTUAL BACKGROUND**

Tim Runyon started working for AET in February 2005 through on assignment from Kelly Temporary Services.  On June 8, 2005, AET hired Runyon, then age forty-five, as a full-time employee to work in the finishing area of the Tenter II plant as a support operator. Don Hamilton ("Hamilton"), the senior process coordinator over Tenters I and II, was Runyon's immediate supervisor.  Bryan Jackson ("Jackson") was the human resources manager.   Hamilton made the hiring and firing decisions for Tenters I and II, after consultation with Jackson; Rich Cope ("Cope"), operations manager and Hamilton's immediate supervisor; and Larry Mauer ("Mauer"), plant manager and Cope's immediate supervisor.

Corbett started at AET in August 2005.  Corbett worked under the same chain of command and had the same job title as Runyon.  In approximately October 2005, Rod Ellis ("Ellis"), a facilitator, became Runyon's and Corbett's supervisor.   Ellis reported to Hamilton.

Runyon's personnel file contains records of incidents between Runyon and his co-workers. In August 2005,  Runyon came back from a break, saw that  Jennifer Luz-Reyes ("Luz-Reyes") was struggling to complete her work, and  had some words with her.  Both Runyon and Luz-Reyes talked to Carol Ellis ("Ms. Ellis") about the situation, and Ms. Ellis reported it to Hamilton.  After the shift was over, Luz-Reyes talked to Hamilton about the incident.  Hamilton took notes of their conversation and typed a Note for the Record, which was placed in Runyon's personnel file.  The Note related Luz-Reyes' report that when Runyon had grabbed a pallet to sit down and the pallet bumped the broom she was using to sweep the floor, Runyon yelled at her.  Runyon is quoted in the Note as saying,  "get the

2

[f—ing] broom out of my way."  It states further that "[Runyon] yelled at her again once they got caught up on their work and, when she asked him not to yell at her, [Runyon] said 'you haven't [f—ing] heard me yell yet.'"  (Hamilton Aff., Ex. A.)

The Note further reports that Hamilton discussed the incident with Runyon several days later and Runyon said he did not cuss or yell at Luz-Reyes. He admitted that they had some words between them, but he said that they had discussed the matter and were getting along fine.  Hamilton confirmed this with Luz-Reyes.  No further action was taken.

A second incident was written up and placed in Runyon's personnel file.  It occurred on January 5, 2006, when Runyon and co-worker John Willman ("Willman") became embroiled  in a heated discussion.  Another co-worker, Russ Rutter ("Rutter"), tried to intervene and calm them down.  Rutter sought the aid of Jay Funkhouser ("Funkhouser"), an organization leader.  Runyon told Funkhouser that he was "real close to tearing off [Willman's] f—ing head and walking out of here" and that he "might kick his a—." (Hamilton Aff., Ex. B.)  Funkhouser emailed Hamilton about the incident.  Hamilton talked to both Runyon and Willman and prepared a Note for the Record, which was placed in Runyon's personnel file.  Runyon admits that he told Hamilton that he was ready to quit and "lay [Willman] out when he does" (Hamilton Dep. 81, Ex. 2 at 30) and that he was "ready to knock [Willman's] head off and go outside and wait for County."  (Runyon Dep. at 91.)

A third incident occurred on February 15, 2006, this time involving Runyon and Corbett.  On the night of February 14, 2006, Runyon and another co-worker, Ian Gilbert ("Gilbert"), had been working very hard to keep up with production on Line 4.  They asked Corbett for help.  He had been assigned to Line 5, which at the time was not in production

3

for some mechanical reason.  Corbett and his co-workers, Willman and Neukom, refused to help.  This was reported to Ellis and, during the shift change, Ellis asked Runyon about it, and Runyon told him what had happened.  Ellis emailed Corbett and the others asking them why they did not help on Line 4.

During the night shift on February 15, Runyon and Gilbert were again on Line 4, and Corbett, Willman and Neukom were on Line 5.  At the beginning of the shift, Corbett confronted Runyon and told him that they were written up because of what happened the night before.  Runyon responded expressing his discontent with Corbitt's unwillingness to help accusing Corbett of deliberately avoiding work all night.

Later in the shift, Runyon and Corbett had a physical altercation.  Runyon called Ellis at home to inform him what happened.  Ellis went to the plant to investigate.  He interviewed Runyon, Corbett, Gilbert, Neukom, and others, and prepared a report.  Runyon told Ellis that he and Corbett had exchanged words, Corbett made physical contact, and Runyon walked away.  Corbett told Ellis that there was a problem with some pallets, Runyon called him a "f—ing prick," and Corbett eventually grabbed Runyon and lifted him into the air.  (Ellis Aff., Ex. A.)  Corbett believed that he was defending himself because Runyon stepped toward him first.

Gilbert reported that Runyon and Corbett were bickering back and forth, got into each other's face, and had their hands on each other, pushing around some.  Gilbert did not see who initiated the physical contact.  Gilbert intervened to break them up.  Neither Willman, Neukom, nor the others Ellis interviewed observed what had happened, although Jamey Wittenmyer and Brenda Smith heard yelling and cussing.  Ellis gave his report to Hamilton.

4

After the altercation between Runyon and Corbett, an investigation was made by Ellis. Ellis interviewed both Runyon and Corbett. Ellis concluded, "In this confrontation [Runyon] antagonized [Corbett] and [Corbett] physically picked [Runyon] up by his arms and sat him back down." AET 0040.

Hamilton decided what level of discipline to issue as a result of the Runyon-Corbett incident. In doing so, he relied on Ellis's written reports; he did not interview any witnesses independently of Ellis. Hamilton drafted a Final Written Warning to Runyon. The warning described the situation as a physical confrontation between Runyon and Corbett and indicated that Runyon had two other altercations with co-workers, one of which resulted in Funkhouser stepping in to diffuse the situation. In addition to giving Runyon the Final Written Warning, Hamilton suspended Runyon from work for three days. Hamilton also requested that letters of apology be written by both men and delivered to the management group.

Runyon's letter was written in response to AET's request in writing from Ellis and Hamilton. (AET 0040 Ex. 8, part 2.) AET wrote, "2. [Runyon] will be required to write a letter to Tenter II management describing how his behavior will change in the future and why he should be allowed to continue employment at AET." Corbett was disciplined in the same way as Runyon and was asked in the same language to write an apology letter.

Runyon's letter read:

> As requested by Mr. Hamilton I am writing ths letter explaining why I should continue employment with A.E.T.
>
> Since my employment began at A.E.T. I have never missed a schedule shift, or any on call's or mandatory over time. I have also followed our JSA's and our GQS. I am also committed to our statement "we will meet or exceed our customers ---- expectations."

I love working for A.E.T. and expect to retire from our great company. Between now and then, it is my intention to move into other areas of the production process and become more involved in the production of our product.

In closing, I would like to apologize for the issue that has occured (sic) in leading to this letter and will strive to avoid any further conflicts with my co-workers.

(AET 0041, Ex. 8, part 2.)

Corbett's letter read:

I would like to apologize for my actions at work on the night of Wednesday, February 15th. My actions were not acceptable behavior for any workplace standards and I assure the Tenter 2 plant that this behavior from me, will not take place in the plant again. I reacted to a situation too quickly, without thinking about the consequences and the way in which my peers would view me. My desire at AET is to be trustworthy, honest, dedicated, and hardworking employee and I understand that my actions on 2/15/06 are in no way a reflection of those qualities that I bring to work each day. In the future, if faced with this type of situation again, I will walk away and notify plant supervision of the disagreement.

I have expressed my feelings and apology in this letter, and I hope that you consider this in determining my future at AET. I bring the above mentioned qualities to work each day along with attention to detail that I feel could benefit AET for years to come. I would like to be looked upon as a leader in my duties, and allowing me to continue my employment at AET would help this become a reality. Sorry for my actions and please accept this sincere apology.

Thank you for your time and consideration.

(AET 0037, Def.'s Ex. 6.)

Hamilton reviewed each letter. He did not believe that Runyon adequately explained why he should keep his job or how his behavior would change in the future. Nor did Hamilton believe that Runyon had accepted full responsibility for his actions. Based on the altercation with Corbett and the incidents with Luz-Reyes and Willman, Hamilton believed that Runyon was not able to get along with co-workers and had a pattern of creating a

6

hostile work environment.  Thus, Hamilton decided that Runyon's employment should be terminated.  Hamilton gave this recommendation to his supervisor Cope, plant manager Mauer, and human resources manager Jackson.  Hamilton explained his reasoning to Cope and Mauer and shared Runyon's and Corbett's letters with them.  Hamilton did not recommend that Corbett be terminated.  He believed that Corbett's letter showed regret for the incident and described how Corbett's behavior would change and that Corbett had accepted responsibility for his actions.

Jackson testified that Runyon's letter did not follow all of the objectives outlined in his Final Written Warning.  Jackson also testified that in his opinion, Runyon's letter did not adequately address how Runyon's behavior would change in the future.  As a result, Runyon's employment was terminated.  Hamilton and Ellis called Runyon at home and told him that the management team had decided to terminate his employment.

## II. DISCUSSION

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A plaintiff opposing a summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  He must point to sufficient evidence that would permit a trier of fact to return a verdict in his favor.  *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008).  When considering a summary judgment motion, the Court construes

all facts and reasonable inferences in favor of the nonmoving party; however, "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Tubergen v. St. Vincent Hosp. & Health Care Ctr.*, 517 F.3d 470, 473 (7th Cir. 2008).

Under the ADEA, it is unlawful for an employer to discharge an employee because of his age. 29 U.S.C. § 623(a)(1). To prevail on his claim, Runyon must establish that his age "actually motivated" AET's decision to terminate his employment. *Faas*, 532 F.3d at 641 (quotations omitted). Thus, he must show that his age "actually played a role in [AET's decisionmaking] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (quotation omitted).

Runyon may prove his claim through either the direct or indirect method of proof. *Faas*, 532 F.3d at 641. The direct method may involve direct evidence, such as an admission by the employer or a smoking-gun, as well as circumstantial evidence suggestive of discrimination. *Id.* "The 'indirect method' of proof involves a certain subset of circumstantial evidence . . . that conforms to the prescription of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490-91 (7th Cir. 2007). Runyon proceeds under both methods, however, the Court concludes that, at a minimum, Runyon's ADEA claim survives summary judgment under the indirect method.

Under the indirect method, Runyon first must establish a prima facie case of age discrimination: (1) that he is a member of a protected class, over age forty; (2) his performance met AET's legitimate expectations; (3) he was subjected to an adverse

employment action; and (4) AET treated similarly situated employees who were substantially younger more favorably.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996); *Faas*, 532 F.3d at 641.  If Runyon establishes a prima facie case, then the burden shifts to AET to provide a legitimate, nondiscriminatory reason for its decision to terminate his employment.  *Faas*, 532 F.3d at 641-42.  If AET meets this burden, then Runyon must show that the proffered reason is a pretext for age discrimination.  *Id.* at 642.  AET claims that Runyon was not meeting its legitimate expectations during his brief eight-month tenure, because he was involved in three altercations with co-workers.  AET also claims that Runyon cannot satisfy the fourth element of his prima facie case—that a similarly situated, substantially younger employee was treated more favorably.[1]

When a plaintiff presents evidence that raises an inference that an employer's legitimate expectations were applied in a disparate manner, which Runyon does here, "the second and fourth elements of the prima facie case are closely intertwined with the pretext analysis, and the two inquiries may be merged and considered together."  *Id.*  Thus, the Court considers whether Runyon has offered sufficient evidence of pretext.

AET contends that it had a legitimate, nondiscriminatory reason for terminating Runyon: he was involved in two prior altercations with co-workers, he created a hostile environment, and he failed to provide a sufficient reason in his letter for AET to keep him employed.  Runyon contends that AET disparately applied its performance expectations

_____

[1] The parties do not dispute that Runyon is a member of a protected class and was subjected to an adverse employment action.

9

by treating similarly situated younger employees more favorably, that is, disciplining him more harshly.

To prove that AET discriminated in the way it applied discipline, Runyon must show that the employee who was treated better shared a "comparable set of failings" with him. *See id.* at 642-43; *see also Herron v. Daimler Chrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (requiring proof of someone "directly comparable" to plaintiff "in all material respects"). In other words, Runyon must show that the other employee "is similarly situated with respect to performance, qualifications and conduct." *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005). This normally requires proof that the "two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 1049-50 (quotation omitted). Runyon need only point to an employee who "engaged in similar–not identical–conduct to qualify as similarly situated." *Id.* at 1050.

Runyon asserts that Corbett is a similarly situated employee. The record establishes that Runyon and Corbett held the same job, had the same supervisor, had approximately the same length of service, and that Corbett (thirty years of age) was substantially younger than Runyon (forty-six years of age). Runyon complains that Corbett physically attacked him and Runyon refrained from retaliation. A reasonable jury could conclude that when AET initially disciplined them equally by giving them a Final Written Warning and a three-day suspension and requiring each to write a letter of apology explaining why AET should keep him employed, they were acknowledging that the two were similarly situated.

10

Moreover, a look at Corbett's personnel file could support the conclusion that the two men were similarly situated.  Corbett's personnel file contains a 120-day evaluation dated February 7, 2006.  In the area of cooperation and ability to work with fellow employees, Corbett scored 4 out of 10.  The following quotation was contained within that evaluation: "[Corbett] has had some small issues with another employee but that has improved."  (Corbett File AET 0061, Pl.'s Resp. Ex. 8.)  Furthermore, in Corbett's annual review dated September 2, 2006, Ellis gave Corbett a 3 out of 10 in "Cooperation," stating, "Frequently fails to get along with other employees" and "[had] a major issue with another employee early in the year.  Has made major improvements since that incident."  (AET 0058)  Moreover, despite the fact that Ellis rated Corbett low on cooperation because he "frequently failed to get along with other employees," there are no notes in Corbett's file that identify the other incidents to which this phrase refers.  A reasonable jury could infer that Ellis understated his report of Corbett's behavior and purposefully withheld written reports of Corbett's misconduct because he favored the younger worker.

Neither of Runyon's first two incidents resulted in anyone being written up or warned.  In fact, the only documentation for those events appear in Runyon's file.  (Fed. R. Civ. P. Dep. at 15-17; Jackson Dep. at 55-56.) Moreover, the one time that Runyon was evaluated in the "Cooperation" category, the evaluator wrote, "Works well with co-workers. Has had one dispute with another Packer, which has been resolved.  Never questions or complains when given an additional task."  (AET 0027-28.)  A reasonable inference can be drawn that Runyon was not perceived to be a real problem until the confrontation with Corbett and that relying on Runyon's prior two incidents to deny that Corbett and Runyon were similarly situated individuals is pretextual.   In addition, given that the assignment

11

Runyon got from his boss was to apologize and show why he should remain employed, a reasonable jury could conclude that Runyon's apology letter was sufficient.  This Court finds Corbitt and Runyon to be similarly situated individuals.

These facts cast some doubt on AET's proffered reason for termination.  A reasonable jury could conclude that because Runyon and Corbett were similarly situated as to performance with others, and the disparity of treatment between Runyon and the younger Corbett, a violation of the ADEA has occurred.  Thus the question of whether AET violated the Act is for the jury.  For this reason, AET's Motion for Summary Judgment on Runyon's ADEA claim is **DENIED**.

### III.  CONCLUSION

For the reasons stated herein, the Court **GRANTS in part and DENIES in part** Defendant Applied Extrusion Technologies, Inc.'s, Motion for Summary Judgment.

IT IS SO ORDERED this 12th day of November, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distributed to:

Robert Peter Kondras Jr.
HUNT HASSLER & LORENZ LLP
kondras@huntlawfirm.net

John C. Wilkinson
FLESCHNER, STARK, TANONS & NEWLIN
jwilkinson@fleschnerlaw.com

Amy Suzanne Wilson
LOCKE REYNOLDS LLP
awilson@locke.com

Heather L. Wilson
LOCKE REYNOLDS LLP
hwilson@locke.com